[No. C027948. Third Dist. Nov. 3, 1999.]

COUNTY OF AMADOR, Plaintiff, v.
EL DORADO COUNTY WATER AGENCY et al., Defendants;
PACIFIC GAS AND ELECTRIC COMPANY, Real Party in Interest.

BOYD GIBBONS, as Director, etc., Plaintiff and Respondent, v.
EL DORADO COUNTY WATER AGENCY et al., Defendants and
Appellants;
PACIFIC GAS AND ELECTRIC COMPANY, Real Party in Interest and
Respondent.

LEAGUE TO SAVE SIERRA LAKES, Plaintiff and Respondent, v.
EL DORADO COUNTY WATER AGENCY et al., Defendants and
Appellants;
PACIFIC GAS AND ELECTRIC COMPANY, Real Party in Interest and
Respondent.

932

936

## Counsel

Noble Sprunger and Philip H. Weber for Defendant and Appellant El Dorado Irrigation District.

Louis B. Green, County Counsel, Thomas D. Cumpston, Deputy County Counsel; Remy, Thomas and Moose, James G. Moose, John H. Mattox and Erik K. Spiess for Defendant and Appellant El Dorado County Water Agency.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Roderick E. Walston and Richard M. Frank, Chief Assistant Attorneys General, Charles W. Getz IV, Assistant Attorney General and Ellen M. Peter, Deputy Attorney General, for Plaintiff and Respondent Department of Fish and Game.

Earthjustice Legal Defense Fund and Stephan C. Volker for Plaintiff and Respondent League to Save Sierra Lakes.

No appearance for Real Party in Interest and Respondent.

## Opinion

HULL, J.—Under the best of circumstances, cases involving the California Environmental Quality Act (CEQA) are complicated. Legal questions resist easy resolution, and records are voluminous. That is particularly true when

cases involve crucial matters such as population growth, increased demands for water, and the threatened degradation of natural resources. If a case also involves procedural anomalies, matters become that much more difficult.

This is such a case. Defendants El Dorado County Water Agency (Water Agency) and El Dorado Irrigation District (Irrigation District) embarked on an ambitious project to provide water to a burgeoning population. The need for new water supplies was predicated on projections contained in a draft, unadopted general plan.

The plan to increase water supplies had two distinct aspects. The first involved the Water Agency's water program and the proposed El Dorado project, which was designed to take approximately 17,000 acre feet of water per year (af/yr)[1] for consumptive use from three high Sierra lakes. The Water Agency and the Irrigation District prepared an environmental impact report (EIR) and certified it as complying with CEQA.

The second component involved the proposed purchase of "Project 184," a hydroelectric project, from Pacific Gas and Electric Company (PG&E). In addition to gaining ownership of this project, defendants also sought to shift the focus of Project 184 to provide not only hydroelectric power, but consumptive water supplies as well. The Irrigation District concluded this project was exempt from CEQA review requirements.

These decisions were challenged by plaintiffs Department of Fish and Game (the Department), Amador County (Amador), and a coalition led by the League to Save Sierra Lakes (collectively referred to as the League). This coalition included Alpine County, environmental groups, and area homeowners associations.

The trial court agreed with many of plaintiffs' claims and issued a writ of mandate. As recounted in greater detail later in this opinion, the court ordered defendants to set aside their approvals of the EIR's as well as their adoptions of findings of fact and statements of overriding concerns. The court also ordered the Irrigation District to set aside its notice of exemption for Project 184, and suspended any operation of Project 184 for consumptive water use until the Irrigation District complied with CEQA.

Both the Water Agency and the Irrigation District appeal, raising various claims relating to the Water Agency's water program and the El Dorado

---

[1] "An acre-foot is 43,560 cubic feet. Colloquially, it is an irrigation-based measurement equalling the quantity of water required to cover an acre of land to a depth of one foot." (*Brydon* v. *East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 182, fn. 1 [29 Cal.Rptr.2d 128].)

project. They assert subsequent actions by El Dorado County (the County) and the State Water Resources Control Board (SWRCB) moot many of the court's concerns. They also contend that, contrary to the trial court's assessment, the certified EIR's met CEQA requirements. We conclude the matters are not moot. We further conclude that the EIR is fundamentally flawed because it is predicated on a draft, unadopted general plan.

The Irrigation District also contends the court's rulings regarding Project 184 are erroneous. Specifically, it asserts: (1) CEQA challenges are preempted by the Federal Power Act (16 U.S.C. § 791a et seq.); (2) plaintiffs' claims are barred by the statute of limitations; and (3) Project 184 is categorically exempt from CEQA review requirements. We reject each of these assertions, and affirm.

## FACTS AND PROCEDURAL HISTORY

Caples Lake, Silver Lake, and Lake Aloha are three high Sierra lakes that are widely used for recreational purposes. Through its Project 184, PG&E diverted and stored water at these lakes, and then released water as needed to generate hydroelectric power.

In March 1991, defendants Water Agency and Irrigation District filed a joint water rights application with the SWRCB for the stored water volume of these lakes and for diversion of this water from the South Fork of the American River for consumptive water use in the County. This proposal required environmental review under CEQA.

In September 1992, defendants prepared a draft EIR (DEIR) for the Water Agency's water program and El Dorado project for the Irrigation District service area. This document was designed to provide a broad overview of water delivery options as well as in-depth analysis of one specific project, the El Dorado project, the joint water rights application for consumptive water supply. The DEIR indicated that the primary objective of the proposed water program was "to deliver sufficient water supplies to meet projected long-term (2020) demands within the El Dorado Irrigation District . . . service area," that is, "the projected growth anticipated in the general plan update." This general plan update was in draft form and had not yet been adopted by the County.

The DEIR outlined the proposal as follows: "PG&E, in connection with Federal Energy Regulatory Commission Project No. 184 (PG&E's El Dorado Project), possesses various water-related facilities, including dams, reservoirs, diversions, and conveyances, which are related to power generation at El Dorado and Chili Bar Powerhouses. PG&E possesses the nonconsumptive (power) water rights to operate these facilities and certain pre-1914

consumptive water rights. [¶] [The Water Agency and Irrigation District] have submitted a joint application to SWRCB for consumptive use rights to waters stored by PG&E and to certain direct diversion amounts from South Fork American River using PG&E's El Dorado Canal . . . . [The Water Agency and Irrigation District] intend to use the supplemental water from PG&E to meet growing demands, especially in dry and critically dry years. The combined safe yield from these rights would be about 17,000 af/yr, assuming that water is delivered on a schedule and to locations (such as Folsom Reservoir) appropriate to [the Irrigation District's] requirements and that PG&E's current mode of operation does not change. . . . No changes in the operation of [the lakes] would occur under the El Dorado project."

The DEIR stated that controversy had arisen over the possible effects of the El Dorado project on the Sierra lakes. The DEIR concluded "the proposed program would not alter the way in which PG&E operates these facilities. Therefore, the proposed program would not affect these resources."

Numerous problems were raised during the period for public comment. For example, the League and the Department argued the DEIR did not describe PG&E's historical operation of the lakes with any specificity, thus limiting the ability to measure any impact on these resources. The League also noted that the general plan process was incomplete and that the relationship between growth and water supplies was not discussed adequately in the DEIR.

Defendants responded that no change in the DEIR was necessary, and in March 1993, they issued a final EIR (FEIR). In May 1993, defendants certified the FEIR, adopted findings of fact and a statement of overriding considerations, and posted a notice of determination.

The Department, the League, and Amador filed legal challenges to this determination.

SWRCB held a hearing on defendants' joint water rights application, and in October 1993 issued a letter stating the record did not contain substantial evidence to support that request. Defendants subsequently submitted an amended joint water rights application to SWRCB, changing the point of diversion to Folsom Reservoir and specifying the amount of consumptive use to be 17,000 af/yr. In July 1995, a draft supplemental EIR

(DSEIR) was prepared and a final supplemental EIR (FSEIR) was prepared in October 1995. Defendants again adopted findings of fact and a statement of overriding considerations.

While these efforts were pending before the SWRCB, the Irrigation District learned that PG&E was interested in selling Project 184, the hydro-electric generation project that utilized the three Sierra lakes. As recounted in greater detail below, the Irrigation District decided to try to acquire this facility. Initially, the Irrigation District apparently intended to do an environmental analysis of this acquisition. Instead, it concluded this purchase was exempt from CEQA and adopted a notice of exemption in April 1995. In September 1995, the Irrigation District proceeded with steps to purchase Project 184.

Plaintiffs amended their writ petitions to include challenges to the acquisition of Project 184. Ultimately, all of the claims brought by the Department, the League, and Amador were consolidated into one writ petition, and the matter was assigned to Retired Appellate Justice Winslow Christian.

The court found many of plaintiffs' claims to be meritorious and granted the petition. As outlined in detail below, the court concluded the EIR's were inadequate and the acquisition of Project 184 was not exempt from CEQA review.[2]

The Water Agency and the Irrigation District appeal.[3]

## GENERAL CEQA PRINCIPLES AND STANDARD OF REVIEW

The law relating to CEQA is grounded in statutory provisions (Pub. Res. Code, § 21000 et seq. [further section references are to the Public Resources Code unless otherwise designated]), administrative regulations (Cal. Code Regs., title 14, § 15000 et seq. (hereafter referred to as Guidelines)) and nearly 30 years of judicial decisions. ■ "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment

---

[2] Although the Water Agency complains the trial court failed to resolve all of the issues presented in plaintiffs' writ petition, it expressly limits its arguments to issues determined by the court.

[3] In accordance with the parties' settlement agreement, we granted the motions of the Water Agency and Irrigation District to dismiss Amador as a respondent in this appeal.

within the reasonable scope of the statutory language.' [Citation.] . . . 'It is, of course, too late to argue for a grudging, miserly reading of CEQA.' [Citation.] The Legislature has emphasized that 'It is the intent of the Legislature that all agencies of the state government which regulate activities . . . which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage. . . .' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

■ "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights I, supra,* 47 Cal.3d at p. 392.)

While CEQA does not guarantee that decisions will always favor environmental considerations, it does promote informed decisionmaking. (*Stanislaus Natural Heritage Project* v. *County of Stanislaus* (1996) 48 Cal.App.4th 182, 196 [55 Cal.Rptr.2d 625].) In *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*), the California Supreme Court reiterated that the purpose of an EIR is " 'to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made.' " (*Id.* at p. 1123, original italics.) ■ The court then succinctly summarized the CEQA review process:

"With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' [Citations.]

NOTICE TO SUBSCRIBERS

Below is a paste-over Crack-and-Peel insert for correction of an error in the bound volume report of County of Amador v. El Dorado County Water Agency (1999) 76 Cal.App.4th 931. Please remove the peel-off backing from the correction insert and position it to cover the last full paragraph on page 945.

We apologize for the inconvenience. If you have any questions, please call West Group Customer Service at 800-328-4880.

**(4)** The standard of review in an action to set aside an agency determination under CEQA is governed by section 21168 in administrative mandamus proceedings, and section 21168.5 in traditional mandamus actions. The distinction between these two provisions "is rarely significant. In either case, the issue before the trial court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence." (*Gentry* v. *City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375 [43 Cal.Rptr.2d 170]; see also *Laurel Heights I, supra,* 47 Cal.3d at p. 392, fn. 5.)

' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.' [Citations.]

"When an EIR is required, the lead agency initially prepares a draft EIR. Once the draft EIR is completed, a comment period is provided for the public and interested agencies. [Citations.] Public hearings to discuss the draft EIR are encouraged, but not required. [Citation.] . . .

"In the course of preparing a final EIR, the lead agency must evaluate and respond to comments relating to significant environmental issues. [Citations.] In particular, the lead agency must explain in detail its reasons for rejecting suggestions and proceeding with the project despite its environmental effects. [Citation.] 'There must be good faith, reasoned analysis in response [to the comments received.] Conclusory statements unsupported by factual information will not suffice.' [Citation.] Thus, it is plain that the final EIR will almost always contain information not included in the draft EIR.

"The final substantive step in the EIR review process is certification of the final EIR. The lead agency is required to certify that the final EIR has been completed in compliance with CEQA, and that it reviewed and considered the information in the final EIR prior to approving the project. [Citation.] CEQA also requires that, before approving a project, the lead agency 'find either that the project's significant environmental effects identified in the [final] EIR have been avoided or mitigated or that the unmitigated effects are outweighed by the project's benefits.' " (*Laurel Heights II, supra,* 6 Cal.4th at pp. 1123-1124.)

■■■ The standard of review in an action to set aside an agency determination under CEQA is governed by Guidelines section 21168 in administrative mandamus proceedings, and Guidelines section 21168.5 in traditional mandamus actions. The distinction between these two provisions "is rarely significant. In either case, the issue before the trial court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375 [43 Cal.Rptr.2d 170]; see also *Laurel Heights I, supra,* 47 Cal.3d at p. 392, fn. 5.)

Substantial evidence challenges are resolved much as substantial evidence claims in any other setting: a reviewing court will resolve reasonable doubts in favor of the administrative decision, and will not set aside an agency's

determination on the ground that the opposite conclusion would have been equally or more reasonable. (*Laurel Heights I, supra,* 47 Cal.3d at pp. 392-393; *San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704]; *Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 369 [7 Cal.Rptr.2d 307].)

A claim that an agency failed to act in a manner required by law presents other considerations. Noncompliance with substantive requirements of CEQA or noncompliance with information disclosure provisions "which precludes relevant information from being presented to the public agency . . . may constitute prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (§ 21005, subd. (a).) In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial. (*Sierra Club* v. *State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236-1237 [32 Cal.Rptr.2d 19, 876 P.2d 505]; *Fall River Wild Trout Foundation* v. *County of Shasta* (1999) 70 Cal.App.4th 482, 491-493 [82 Cal.Rptr.2d 705]; *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650]; *East Peninsula Ed. Council, Inc.* v. *Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 174 [258 Cal.Rptr. 147] (*East Peninsula*); *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1021-1023 [192 Cal.Rptr. 325].)

As we explained: "The trial court may not exercise its independent judgment on the omitted material by determining whether the ultimate decision of the lead agency would have been affected had the law been followed. The decision is for the discretion of the agency, and not the courts." (*Rural Landowners Assn.* v. *City Council, supra,* 143 Cal.App.3d at p. 1023.)

"On appeal, the appellate court's 'task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law.' " (*Gentry* v. *City of Murrieta, supra,* 36 Cal.App.4th at p. 1375.) "We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA

requirements." (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].)

<span style="text-align:center">DISCUSSION</span>

*Claims Relating to the Water Program and El Dorado Project[4]*

<span style="text-align:center">I</span>

<span style="text-align:center">*Mootness*</span>

Citing cases such as *Environmental Coalition of Orange County, Inc.* v. *Local Agency Formation Com.* (1980) 110 Cal.App.3d 164, 170-173 [167 Cal.Rptr. 735], the Water Agency and Irrigation District contend aspects of the court's writ have become moot due to subsequent actions taken by two other entities, the County and the SWRCB. We do not agree.

A. *County Approval of General Plan*

In ruling that the Water Agency failed to provide the necessary analysis of mitigation measures and project alternatives, the court noted that the EIR's "illegally preceded El Dorado County's adoption of a new General Plan in 1996."

The Water Agency and Irrigation District assert the County's approval of a general plan in January 1996 validated the demand for new water supplies, and provided sufficient discussion of alternatives and mitigation measures to rectify any problem in the EIR at issue here. Therefore, they claim, this matter is moot. We disagree for various reasons.

First, the Sacramento County Superior Court has determined that the 1996 general plan is inadequate in many respects and must be redrafted.[5] We note that no appeal has been taken from that decision, Sacramento Superior Court case No. 96SC01290, *El Dorado County Taxpayers for Quality Growth v. El*

---

[4]Our separate analysis of the issues relating to Project 184 and those relating to the Water Agency program and the El Dorado project is not meant to imply that these two areas are in fact distinct, unrelated projects. It simply tracks the analysis of the parties. In their respondents' briefs, plaintiffs suggest that these two components are sufficiently interrelated to require a single environmental review. However, they did not file cross-appeals raising this claim, and we therefore do not reach this question.

[5]The League asks that we take judicial notice of the reporter's transcript of a hearing held in that case on April 22, 1999. Because that hearing is irrelevant to the issues before us, we deny that request. For the same reason, we deny the Water Agency's requests for judicial notice of various rulings and documents.

*Dorado County Board of Supervisors.* Consequently, a mootness claim is untenable. Inadequate analysis in an invalid general plan cannot substitute for the analysis required in the instant case. (*Hewlett* v. *Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 525 [63 Cal.Rptr.2d 118].)

Perhaps more importantly, the fact that the El Dorado County Board of Supervisors considered mitigation measures and project alternatives had no bearing on whether the lead agency did the same before approving this project. Since the purpose of an EIR is to ensure an informed public and informed decisionmaking (*Laurel Heights II, supra,* 6 Cal.4th at p. 1123; *Chaparral Greens* v. *City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1142 [58 Cal.Rptr.2d 152]), another entity's subsequent determinations are irrelevant when considering whether the lead agency complied with CEQA mandates.[6]

## B. *State Water Resources Control Board's Adoption of D-1635*

The trial court ruled that the EIR's did not adequately assess the project's impacts on fishery resources and lake levels. The court noted once an adequate environmental analysis was done "of the impacts of the proposed project to divert 17,000 af/yr. of water for consumptive use from Project 184, [the Water Agency and Irrigation District] might need to develop mitigation measures to protect the existing environment. These mitigation measures could include a measurable, specified water release schedule that does not adversely impact the upper watershed lakes. Mitigation measures should minimize the adverse impacts on the upper watershed lake levels and on the stream flows from these upper watershed lakes and through the South Fork American River."

The Water Agency and the Irrigation District assert the SWRCB imposed conditions relating to water flows and lake levels in its October 1996 decision, D-1635, thereby providing the requisite impacts analysis and mitigation measures.

---

[6]The Water Agency also suggests the trial court erred in denying its motions for judicial notice of the County's approval of the general plan. Plaintiffs counter that this motion was not made in a timely manner. Because we have rejected the Water Agency's claim of mootness, we have no occasion to resolve these procedural issues. To the extent the Water Agency's comments can be construed as a motion that this court take judicial notice of the 1996 general plan, we deny that request.

However, on November 21, 1996, the SWRCB issued water rights order No. 96-06, directing reconsideration of D-1635.[7] The SWRCB has not yet issued its decision on reconsideration. Because reconsideration has been granted, D-1635 is of no effect. It therefore cannot be deemed to "moot" anything.

The Water Agency notes it did not challenge D-1635 and remains committed to implement the conditions set forth in that decision. This commitment is admirable. However, given that D-1635 is, for all intents and purposes, nonexistent, we cannot put much stock in a willingness to agree to phantom terms. Unlike the Water Agency, we will not speculate that the same mitigation measures will ultimately be imposed by SWRCB.

In sum, the matters before us are not moot.

II

*EIR Predicated on Draft General Plan*

The EIR states, and defendants readily acknowledge, that the primary purpose of the water program is to provide water supplies to meet projected increased populations. These projections were contained in a draft general plan. In other words, water policy was predicated on the population forecasts of an unadopted general plan, and water projects were tailored to the needs outlined in that still-to-be finalized document. In this case, approving a water program before enacting a general plan places the proverbial cart before the horse.

A general plan serves as a "charter for future development" (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 540 [277 Cal.Rptr. 1, 802 P.2d 317]) and embodies "fundamental land use decisions that guide the future growth and development of cities and counties." (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 532 [160 Cal.Rptr. 907].) " ' "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements" [statutorily required elements include land use, circulation, housing, conservation, open space and noise].' [Citations.] 'The consistency doctrine has been described as "the linchpin of

---

[7] We grant the requests of the Department and the Water Agency to take judicial notice of water rights order No. 96-06.

California's land use and development laws; it is the principle which in-fuse[s] the concept of planned growth with the force of law." . . .' " (*Families Unafraid to Uphold Rural etc. County* v. *Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 [74 Cal.Rptr.2d 1] (*Families Unafraid*).)

 Had a general plan reflecting population and development policies been adopted, a water project to meet those needs would certainly have been appropriate. Here, however, the new general plan had *not* been adopted. The proposed water project was not designed to be compatible with the existing general plan, but with the new draft plan. This sequence of events— approving a water program before adopting a general plan—precludes any proper review of significant growth issues. We explain.

In determining whether and where to permit development, a county must necessarily consider the availability of consumptive water supplies. If additional water supplies are available, growth and development are feasible. Conversely, if that water is not available, growth is necessarily limited.

If a general plan calls for increased development and population, a water plan designed to meet that need makes sense. But here, no such determina-tion was made. The County had not yet adopted a general plan or made final decisions on growth issues, and there was no final expression of county policy on these matters. By proposing a water project to meet the needs of the draft general plan, the analysis of certain issues was circumvented. That is, once the project made an additional 17,000 af/yr of water available, one of the natural barriers to growth was removed, and one of the major issues related to development no longer had to be considered.

By proceeding without the benefit of the general plan in place, and by developing projects predicated on needs described in an unadopted plan, the CEQA process is stood on its head. Instead of proceeding from a more general project to more specific ones, as is commonplace in tiering (see Guidelines, § 15152), the exact opposite occurs: a specific water project drives the general plan process. The issues become circular: water supply projects are adopted to meet growth plans outlined in a draft general plan, and the general plan is then adopted because an adequate water supply exists for the outlined development plans.

Defendants insist that it is not their function to assess these growth impacts as that is the provenance of the County Board of Supervisors. That

may be, but it only underscores the problem. Under the present scenario, no entity has contemplated the interrelationship of growth and water sources. Making 17,000 af/yr of water available for consumptive purposes removes a major barrier to growth and can virtually ensure development. (See *City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325, 1337 [232 Cal.Rptr. 507].) By predicating a project on a draft general plan, without the benefit of a final expression of County policy, there is no guarantee that the inextricably linked issues of water supply and population growth will ever receive the appropriate environmental review. The County would have no reason to analyze what has become a nonexistent issue. Where, as here, there is a significant possibility, if not a probability, that there will be no analysis or reasoned consideration of the adoption of a general plan that restricts growth to a level less than that which will require an additional 17,000 af/yr, which restrictions would require less water and perhaps effect a different impact on the environment, the CEQA process has been abused.[8]

Our concern is heightened by the fact that the 1996 general plan has been judicially determined to be inadequate. Thus, the water project at issue here loses even the tenuous link it had with county plans, and results in a water project designed to meet a need that has not yet been sufficiently analyzed or officially determined. That clearly is not what CEQA intends.

Again, we reiterate that we do not substitute our judgment for that of the people or their local representatives. (See *Rio Vista Farm Bureau Center* v. *County of Solano, supra,* 5 Cal.App.4th at p. 369.) Growth issues are matters to be resolved by the citizens of the County and their elected representatives. We hold only that, in this case, an EIR predicated on a draft general plan is fundamentally flawed and cannot pass CEQA muster.

---

[8]Government Code section 65361 provides a means for a county to approve projects while a general plan is being prepared. For example, in *Families Unafraid* the Office of Planning and Research (OPR) required the county to make findings that (1) any approved development be consistent with the public review draft general plan, and (2) that there be little probability that the development would interfere with the future adopted general plan. (62 Cal.App.4th at p. 1336.) Here, defendants did not act pursuant to this statute, so we have no reason to examine this provision at any length. We note, however, that problems may arise if projects proceed under this statute in accordance with the draft general plan, and that plan is ultimately found to be inadequate. Theoretically, a project could be undertaken that conflicts with the general plan as finally adopted. We leave this dilemma for another day and a more appropriate case.

This conclusion obviates the need to address issues relating to the adequacy of impacts analysis, mitigation measures, or proposed project alternatives.[9] For the guidance of the parties, however, we briefly address one other issue, the adequacy of the description of the baseline environment and historic operations. We turn to that matter now.

## III

*Description of Baseline Environment and Historic Operations*

■ Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment. It is only against this baseline that any significant environmental effects can be determined. (Guidelines, §§ 15125, 15126.2, subd. (a).)

Here, the Water Agency asserted it intended to follow PG&E practices and would release water from the three Sierra lakes in the same manner as PG&E. The EIR's therefore provide limited discussion of the lake resources, because they conclude the El Dorado project would not change the operation of the lakes or have any effect on these resources.[10]

Documents submitted as part of the environmental analysis purported to describe this historical operation. A hydrologist's report listed the water levels of the three impacted lakes at the end of each month over a period of many years. The Water Agency also asserted that historical operations could be determined by reference to the Federal Energy Regulatory Commission (FERC) requirements for Project 184.

The trial court concluded this baseline description was inadequate: "The 1993 FEIR and 1995 FSEIR were inadequate for failure to disclose the

---

[9]We note, however, that alternatives and mitigation measures suggested in this appeal may appropriately be considered in a revised EIR. For example, plaintiffs question whether a water project might be designed that draws less water (perhaps 10,000 af/yr) from the Sierra lakes. Or, they suggest, Folsom Lake might be utilized for water storage and thereby reduce the need to draw down the lakes. Contrary to an underlying suggestion by defendants, project opponents do not bear the burden of identifying reasonable project alternatives. (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus, supra,* 27 Cal.App.4th at p. 737.) We express no opinion as to whether the proposed alternatives are feasible or desirable. Instead, we simply observe that when the EIR is redrafted, these points may be considered in accordance with well-established CEQA principles. (E.g., *Stand Tall on Principles* v. *Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 786-787 [1 Cal.Rptr.2d 107]; *Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at pp. 730-731.)

[10]We defer to a later part of this opinion our comments on the effects of a change in ownership from PG&E to the Irrigation District and of a change in purpose from hydroelectric to consumptive use.

impacts upon the fishery resources and upon lake levels (and resulting recreational uses) in Caples Lake, Silver Lake, and Lake Aloha ('upper watershed lakes'), occasioned by the proposed new, consumptive inelastic use of 17,000 acre-feet/year ('af/yr.'). In a new environmental document, [defendants] should specify the baseline environment of actual, existing water releases from storage, particularly in dry years, including timing and duration of these water releases, from each of the upper watershed lakes and analyze the resulting lake levels. [CEQA] requires a description of the existing environment before the commencement of the project. The 1993 FEIR and 1995 FSEIR analysis of 'historical operations' is meaningless, because [defendants] cannot establish how [PG&E] would operate Project 184 in a particular year. Similarly, the [FERC] requirements for Project 184 do not define the existing, baseline environment. To properly analyze the environmental impacts of the proposed project, [defendants] must specify a specific water release schedule and operations plan for wet, dry and normal years. This schedule and operations plan must demonstrate the timing, location, and amount of water releases from the upper watershed lakes, and the resulting lake levels, to provide the 17,000 af/yr. This water release schedule and operations plan should focus on the environmental impacts of this proposed water release schedule for the 17,000 af/yr. and must be compared with the existing [PG&E] actual, existing water release and lake levels baseline, to determine if the proposed project (17,000 af/yr. of water for consumptive use) would adversely affect the existing environment."

The Water Agency and Irrigation District contend that these conclusions were erroneous and that the EIR contained an adequate description of the baseline environment from which to assess impacts of the proposed project. They assert the trial court's decision required impossible exactness in a timetable for future operations.

Plaintiffs counter that the EIR's baseline description was inadequate as it was limited to a recitation of month-end lake levels, and failed to explain how those lake levels were derived or maintained.

This dispute highlights the importance of an adequate baseline description, for without such a description, analysis of impacts, mitigation measures and project alternatives becomes impossible. Guidelines section 15125, subdivision (a), provides: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally

constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives." Similarly, Guidelines section 15126.2, subdivision (a), also requires that the EIR assess the impacts of a proposed project by examining changes in the existing physical conditions in the affected area.

Here, the question is whether the EIR contains a sufficient description of the baseline environment to make further analysis possible. Guidelines section 15151 requires an EIR to be prepared "with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. . . . [T]he sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (See also *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].) Contrary to the Water Agency's contention, this is not a case involving conflicting expert opinions about historical operation. (See *Laurel Heights I, supra,* 47 Cal.3d at p. 409; *Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 863 [226 Cal.Rptr. 575].) Instead, the issue is the adequacy of the information contained in the EIR.

Plaintiffs insist that the EIR analysis demonstrates only end-of-month lake levels, and ignores other factors relevant to historical operations. Defendants, on the other hand, assert the EIR discloses far more information and in fact contains sufficient information to determine past release schedules in wet, dry and average years.[11]

We agree that a mere recitation of end-of-month lake levels does not provide an adequate description of the existing environment or how PG&E determined water releases. The hydrologist himself referred to this data as a "a presentation of historical observations, rather than an operational analysis."

The month-end water level is only one element of the operation. Just as important to fisheries, river habitat, and recreational users is how those

---

[11]The Water Agency suggests this data was sufficient as evidenced by the fact that SWRCB relied on the same information in establishing conditions for water flows. However, as already noted, SWRCB has vacated that decision.

lake levels were determined. When were releases made and at what rate? What were the factors that determined when releases would be made? Are those factors equally applicable for purposes of power generation and inelastic consumptive use? The month-end lake level could be achieved by constant releases over a period of time or, theoretically, through one rapid and enormous release that adversely affects fisheries and habitats. Reliance on lake levels alone is insufficient to describe the current release program or to assess the impacts of the proposed project.

Nor does the FERC license describe existing conditions. Minimum stream flow requirements do not describe actual water releases. An EIR must focus on impacts to the existing environment, not hypothetical situations. (See *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 246-247 [227 Cal.Rptr. 899]; *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 352-355 [182 Cal.Rptr. 317].) The fact that water flow must be kept at a certain minimum level does not reveal what flows were actually maintained; higher water flows would comport with FERC requirements, but might adversely affect lake levels and/or the downstream environment.

The Water Agency, and EIR's, also assert the FERC license requires water levels to be kept at levels as high as possible. However, this language appears only in a description of PG&E's proposed operation, not as a mandatory condition of operation. Moreover, even this proposed language was not absolute. For example, it provided that Caples Lake "will be maintained as high as possible during the recreation season *consistent with project demands*." (Italics added.) A virtually identical clause described proposed lake levels in Lake Aloha. The phrase "project demands" provides little enlightenment, particularly when a project shifts from hydroelectric to consumptive purposes.

Defendants insist that there is sufficient documentation in the EIR to discern all necessary information, and plaintiffs insist just as adamantly that there is not. It may well be that by cobbling together information included in and appended to the EIR, a reader might be able to calculate historic water releases and gain a better understanding of how PG&E had operated the lakes in the past and how defendants intended to operate them in the future. But such an effort should not be necessary. An adequate EIR requires more than raw data; it requires also an analysis that will provide decision makers with sufficient information to make intelligent decisions. (See, e.g., Guidelines, § 15151.)

If, as defendants claim, the requisite information is included in the documentation attached to the EIR, setting out that information in a clear analysis within the EIR should not pose any difficulty. Such an explanation will further the principles behind CEQA by ensuring an informed public and informed decision makers.

Finally, if defendants continue their commitment to a project that does not change the historical operation of Project 184, an adequate baseline analysis will not require them to foretell unknowable events or set forth a precise timetable of future operations. Since they predict the future will conform to the past, they need only show what the past has been to adequately assess future impacts.

*Claims Relating to Project 184*

IV

*Preemption*

In issuing its writ, the trial court found "[a]cquisition of Project 184 by . . . Irrigation District from real party in interest [PG&E] is not governed by [CEQA]. Operation of Project 184 by . . . Irrigation District entailing consumptive use of water is governed by [CEQA]." The court ordered the Water Agency and Irrigation District "to suspend all activity pursuant to their decisions that could result in an adverse change or alteration to the physical environment until each respondent has taken all actions to bring their decisions and findings into compliance with [CEQA]. This suspension order applies to any operation of Project 184 by . . . Irrigation District entailing consumptive use of water, but does not otherwise apply to the acquisition of Project 184 by . . . Irrigation District from real party in interest [PG&E]."

The Irrigation District contends plaintiffs' CEQA challenges to the operation of Project 184 are preempted by the Federal Power Act (FPA), 16 United States Code section 791a et seq. (Further statutory references in this part only are to the FPA unless otherwise designated.) We disagree.

Initially, we note that preemption implicates subject matter jurisdiction and cannot be waived. (*DeTomaso* v. *Pan American World Airways, Inc.* (1987) 43 Cal.3d 517, 520, fn. 1 [235 Cal.Rptr. 292, 733 P.2d 614]; *Steele* v. *Collagen Corp.* (1997) 54 Cal.App.4th 1474, 1489 [63 Cal.Rptr.2d 879].) Thus, the Irrigation District's failure to raise this claim in the trial court is of no moment.

██ "Since the decision in *McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 427 [4 L.Ed. 579, 606], 'it has been settled that state law that conflicts with federal law is "without effect." ' [Citation.] [¶] Whether federal law preempts state law 'fundamentally is a question of congressional intent . . . .' [Citations.] [¶] Such preemption is found in 'three circumstances.' [Citation.] 'First, Congress can define explicitly the extent to which its enactments pre-empt state law.' [Citations.] 'Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.' [Citations.] 'Finally, state law is pre-empted to the extent that it actually conflicts with federal law.' [Citations.]" (*Smiley* v. *Citibank* (1995) 11 Cal.4th 138, 147-148 [44 Cal.Rptr.2d 441, 900 P.2d 690]; *Carrillo* v. *ACF Industries, Inc.* (1999) 20 Cal.4th 1158 [86 Cal.Rptr.2d 832, 980 P.2d 386].)

Courts are reluctant to infer preemption and it is the burden of the party claiming preemption to prove it. (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630].)[12]

██ Congress enacted the FPA to ensure a broad federal role in the licensing and development of hydroelectric power. (*California* v. *FERC* (1990) 495 U.S. 490, 496 [110 S.Ct. 2024, 2028, 109 L.Ed.2d 474, 484]; see generally, *First Iowa Coop.* v. *Power Comm'n* (1946) 328 U.S. 152, 180, fn. 23 [66 S.Ct. 906, 919, 90 L.Ed. 1143, 1158] (hereafter *First Iowa*).) Under the FPA, the FERC (formerly the Federal Power Commission) is the only regulatory body authorized to issue licenses for hydroelectric power projects. (§ 797; *Wisconsin Valley Improvement Co.* v. *Meyer* (W.D.Wisc. 1995) 910 F.Supp. 1375, 1378.)

However, as the Supreme Court noted, this broad delegation of power to FERC "hardly determines the extent to which Congress intended to have the Federal Government exercise exclusive powers, or intended to pre-empt concurrent state regulation of matters affecting federally licensed hydroelectric projects." (*California* v. *FERC, supra,* 495 U.S. at pp. 496-497 [110 S.Ct. at p. 2028, 109 L.Ed.2d at pp. 484-485].)

---

[12]The Department contends preemption is not an issue because the state can voluntarily undertake additional environmental review and require its subdivisions to do the same. The Department is wrong. "Political subdivisions cannot assert 'constitutional rights which are intended to limit governmental action vis-à-vis individual citizens' but may invoke the supremacy clause to challenge preempted state law. [Citation.] Otherwise 'such legislation and regulation often would go unchecked even though expressly prohibited by the Constitution.' " (*Star-Kist Foods, Inc.* v. *County of Los Angeles* (1986) 42 Cal.3d 1, 8 [227 Cal.Rptr. 391, 719 P.2d 987].)

The FPA contains a savings clause relating to state laws and water rights. Section 821 provides: "Nothing herein contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."[13] The term "municipal" in section 821 "means pertaining to the public." (*Georgia Power Co.* v. *Baker* (M.D.Ga. 1984) 591 F.Supp. 1569, 1572.)

On its face, this clause might be interpreted as a broad delegation of powers to the state. However, as other courts have noted, we cannot "construe this statute on a blank slate." (E.g., *Sayles Hydro Associates* v. *Maughan* (9th Cir. 1993) 985 F.2d 451, 454.)

In *First Iowa, supra,* 328 U.S. at pages 175-176 [66 S.Ct. at pages 916-917, 90 L.Ed. at page 1156], the United States Supreme Court narrowly construed section 821, holding its effect "in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase 'any vested right acquired therein' further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope unless it be the words 'other uses.' Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes." The court concluded this section was "thoroughly consistent with the integration rather than the duplication of federal and state jurisdictions under the [FPA]." (328 U.S. at p. 176 [66 S.Ct. at p. 917, 90 L.Ed. at p. 1156].)

This narrow reading of section 821 was reaffirmed in *California* v. *FERC, supra,* 495 U.S. at page 497 et seq. [110 S.Ct. at page 2028 et seq., 109 L.Ed.2d at page 485 et seq.]. In that case, the State of California sought to ensure that the operators of a hydroelectric project maintained water flow at a level sufficient to protect the stream's fish. The federal government balked at this effort, asserting FERC had the exclusive authority to set the minimum stream flows for the federally licensed power plant. The state countered that section 821 authorized state regulation of stream flow. (495 U.S. at pp. 494-495 [110 S.Ct. at pp. 2027-2028, 109 L.Ed.2d at p. 483].)

The Supreme Court noted that "[w]ere this a case of first impression, [California's] arguments based on [section 821] could be said to present a

---

[13]This provision is often referred to in case law as "section 27," its internal section number in the FPA statute. We refer to this statute as "section 821."

close question. As [the state] argues, California's minimum stream flow requirement might plausibly be thought to 'relat[e] to the control, appropriation, use, or distribution of water used . . . for . . . other uses,' namely the generation of power or the protection of fish." (*California* v. *FERC, supra,* 495 U.S. at p. 497 [110 S.Ct. at pp. 2027-2028, 109 L.Ed.2d at p. 485].)

But, the court concluded, "the meaning of [section 821] and the preemptive effect of the FPA are not matters of first impression." (*California* v. *FERC, supra,* 495 U.S. at p. 497 [110 S.Ct. at p. 2029, 109 L.Ed.2d at p. 485].) The court reviewed its *First Iowa* decision, issued 44 years earlier, and "decline[d] at this late date to revisit and disturb the understanding of [section 821] set forth [in that case]. . . . *First Iowa's* interpretation of [section 821] does not encompass the California regulation at issue: California's minimum stream flow requirements neither reflect nor establish 'proprietary rights' or 'rights of the same nature as those relating to the use of water in irrigation or for municipal purposes." (*Id.* at p. 498 [110 S.Ct. at p. 2029, 109 L.Ed.2d at p. 486].)

The court reiterated that it would defer "to longstanding and well-entrenched decisions, especially those interpreting statutes that underlie complex regulatory regimes," (*California* v. *FERC, supra,* 495 U.S. at p. 499 [110 S.Ct. at p. 2029, 109 L.Ed.2d at p. 486]) and observed "[t]here has been no sufficient intervening change in the law, or indication that *First Iowa* has proved unworkable or has fostered confusion and inconsistency in the law, that warrants our departure from established precedent." (*Ibid.*)

The court concluded that permitting California "to impose significantly higher minimum stream flow requirements would disturb and conflict with the balance embodied in that considered federal agency determination. FERC has indicated that the California requirements interfere with its comprehensive planning authority, and we agree that allowing California to impose the challenged requirements would be contrary to congressional intent regarding the Commission's licensing authority and would 'constitute a veto of the project that was approved and licensed by FERC.' " (*California* v. *FERC, supra,* 495 U.S. at pp. 506-507 [110 S.Ct. at pp. 2033-2034, 109 L.Ed.2d at p. 491].)

*California* v. *FERC* did not clearly indicate whether its decision was based on an "occupy the field" or "conflict" theory of preemption. However, in *Sayles Hydro Associates* v. *Maughan, supra,* 985 F.2d at pages 455-456, the Ninth Circuit concluded that the FPA occupies the field of federal power projects, and prevents state regulation for anything but proprietary rights to water. Thus, in *Sayles Hydro Associates,* a failure to comply with state

procedural requirements could not justify the SWRCB's refusal to issue an operating permit for a FERC-licensed hydroelectric power project. (See also *Wisconsin Valley Improvement Co.* v. *Meyer, supra,* 910 F.Supp. at pp. 1381-1382.)

Under this rationale, section 821 applies in the instant case only if proprietary rights to water are involved. We conclude they are.

The transfer of Project 184 from PG&E to the Irrigation District is not simply a transfer of ownership; it also proposes a change in water use. The project under new ownership would shift from a single-purpose hydroelectric project to multipurpose use that also permits consumptive use of water. The Irrigation District asserts in conclusory fashion that consumptive water use has nothing to do with proprietary water rights. It is difficult to imagine a more proprietary interest than the consumption of water and its removal from stream flow. Water for hydroelectric purposes may be diverted but ultimately is returned to the water system; it is usufructuary in nature and nonconsumptive. (See *F. P. C.* v. *Niagara Mohawk Power Corp.* (1954) 347 U.S. 239, 246-247 [74 S.Ct. 487, 491-492, 98 L.Ed. 666, 674].) In contrast, water used for consumptive purposes permanently reduces the amount of water that would otherwise be available downstream. State law requiring environmental review for this new proprietary use of water by an irrigation district is clearly one "relating to the control, appropriation, use or distribution of water used . . . for municipal . . . uses . . ." as set forth in section 821.

This case is therefore distinguishable from others cited by the Irrigation District. For example, in *Town of Springfield, Vt.* v. *State, etc.* (D.Vt. 1981) 521 F.Supp. 243, a hydroelectric project involved the development of a recreational area and the relocation of a state highway adjacent to the river. The court noted the FPA reflected "a clear Congressional intent to bring all aspects of the hydroelectric project within the purview of the federal regulatory scheme." (*Id.* at p. 249.) The court then concluded the state did not have concurrent jurisdiction to require a land permit for this work, as "neither the road relocation nor the recreational improvements planned for the Black River project falls within the narrow field reserved for state control by [section 821]." (*Id.* at p. 250.)

Similarly, *California* v. *FERC, supra,* 495 U.S. at page 498 [110 S.Ct. at page 2029, 109 L.Ed.2d at page 486], involved a state effort to set minimum stream flow, a matter that did not involve proprietary water rights, or " 'rights of the same nature as those relating to the use of water for irrigation or for municipal purposes.' "

Here, however, a project for water consumption falls squarely within the parameters of section 821.

Other cases relied upon by the Irrigation District are also inapposite. A central issue in *Escondido Mut. Water Co.* v. *F. E. R. C.* (9th Cir. 1982) 692 F.2d 1223 was whether the FERC had jurisdiction to license a project the main purpose of which was irrigation of reservation land, not power production. The court deferred to the FERC's interpretation of the FPA and concluded that a project that generated any electric power, no matter how minor or how insignificant to the project as a whole, was subject to licensure under the FPA. (*Id.* at pp. 1229-1231.)[14] The scope of section 821 was not at issue and was not addressed.

*National Wildlife Federation* v. *F.E.R.C.* (D.C. Cir. 1990) 912 F.2d 1471, 1482-1483 [286 App.D.C. 117] is similarly limited in its discussion. The fact that FERC has jurisdiction to license dams that are not exclusively or primarily intended for power generation does not resolve the question of preemption or determine the scope of the savings clause of section 821.

The instant case involves both a change in ownership and a change in purpose, i.e., from a project devoted solely to power generation to a project that is also intended for water consumption. Under these circumstances, section 821 applies. There is no preemption.

We note that this conclusion does not interfere in any way with FERC licensing procedures. The environmental review contemplated by CEQA serves an informational purpose. This review does not impose conditions or mandate how a project should be run. It simply explains the effects of the project, reasonable alternatives, and possible mitigation measures "so that the public can help guide decision makers about environmental choices." (*Endangered Habitats League, Inc.* v. *State Water Resources Control Bd.* (1997) 63 Cal.App.4th 227, 242 [73 Cal.Rptr.2d 388].) This situation therefore differs from *California* v. *FERC, supra,* 495 U.S. at pages 494-496 [110 S.Ct. at pages 2027-2028, 109 L.Ed.2d at pages 483-484] and *Sayles Hydro Associates* v. *Maughan, supra,* 985 F.2d at page 453, in which the state sought to impose operating conditions beyond those required by FERC. Requiring CEQA review does not implicate the licensing or operating of hydroelectric power resources. Nor does it vest states with veto power over a federal project. (See *California* v. *FERC, supra,* 495 U.S. at pp. 506-507 [110 S.Ct. at pp. 2033-2034, 109 L.Ed.2d at p. 491].)

---

[14]This case was subsequently affirmed in part and reversed in part by the United States Supreme Court, but the parties did not seek review of the Ninth Circuit's jurisdictional ruling. (*Escondido Mut. Water Co.* v. *La Jolla Indians* (1984) 466 U.S. 765, 772, fn. 12 [104 S.Ct. 2105, 2110, 80 L.Ed.2d 753, 761].)

The writ issued by the trial court properly concluded that CEQA required environmental review of the project's proposed consumptive use of water.[15] This area of concern, involving proprietary water rights and municipal consumptive use for that water, is outside the scope of the FPA by virtue of section 821. The matter is not preempted.

## V

### Statute of Limitations

As noted earlier, CEQA requires an EIR "whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' " (*Laurel Heights II, supra,* 6 Cal.4th at p. 1123; see §§ 21100, 21151; Guidelines, § 15002, subd. (f)(1).) Some projects that do not have a significant environmental effect may be categorically exempt from CEQA review. (See Guidelines, § 15061.) If an agency determines that a project meets the requirements for categorical exemptions, a notice of exemption is prepared and no further environmental review is required. (Guidelines, § 15002, subd. (k)(1); *City of Chula Vista* v. *County of San Diego* (1994) 23 Cal.App.4th 1713, 1719 [29 Cal.Rptr.2d 89] (*Chula Vista*).)

This was the path taken by the Irrigation District when it decided to acquire Project 184. In April 1995, it adopted a notice of exemption and in September 1995, it proceeded with steps to purchase Project 184. Plaintiffs challenged that action.

 On appeal, the Irrigation District asserts this challenge was untimely, because it was not made within 35 days of the filing of the notice of exemption. We disagree. In contravention of CEQA requirements, the Irrigation District did not approve the project before filing a notice of exemption. Consequently, the notice was not valid and the limitations period did not run.

A notice of exemption must include a brief description of the project, a finding that the project is exempt from CEQA, with specific reference to the relevant Guideline or statutory exemption, and a brief statement of reasons supporting the finding. (Guidelines, § 15062, subd. (a)(1-3).)

Depending on whether the filing is done by a state agency, local agency, or applicant, the notice of exemption must be filed with OPR, or the county

---

[15]The Irrigation District makes a passing suggestion in its reply brief that the trial court's directive fails to account for preexisting rights to consumptive water use. The failure to raise this matter without good cause in its opening brief precludes our further consideration of the matter. (*Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].)

clerk of each county in which the project will be located. (Guidelines, § 15062, subd. (c).) In all cases, copies of the notice of exemption must be posted for 30 days. (Guidelines, § 15062, subd. (c)(1), (2), (4)(C).)

Any party objecting to this determination of exemption must file a challenge within 35 days after a valid notice of exemption has been filed. If a notice of exemption is not filed, or is defective in a material manner, the limitations period is extended to 180 days after the project is approved. (Guidelines, §§ 15062, subd. (d), 15112, subd. (c)(2), (5); 21167, subd. (d); *Chula Vista, supra*, 23 Cal.App.4th at pp. 1719-1720.)

One other procedural step bears mention at this time: a notice of exemption cannot be filed until after the project is approved. Guidelines section 15062, subdivision (a), provides: "When a public agency decides that a project is exempt from CEQA and the public agency approves or determines to carry out the project, the agency may file a notice of exemption. *The notice shall be filed, if at all, after approval of the project.*" (Italics added.) The regulations advise that a notice may accompany the project application through the approval process, but may not be filed until the project has actually been approved. (Guidelines, § 15062, subds. (b), (c).)

The Guidelines define "approval" as "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a).) The Guidelines continue: "The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval." (*Ibid.*)[16]

The Irrigation District asserts it filed its notice of exemption in April 1995, following a December 1994 project approval. It contends that plaintiffs' challenge to the exemption determination was untimely as it was not filed until October 3, 1995, long after the 35-day limitations period had run. Plaintiffs counter that the Irrigation District never approved the project before filing its notice of exemption, and thus the notice was invalid. Thus, they argue, their challenge was timely. Plaintiffs are correct.

[16]Requiring project approval before filing a notice of exemption and triggering the challenge period comports with general principles underlying CEQA. A contrary conclusion would be tantamount to requiring opponents to bring challenges before a project is finally approved, lest they be barred by the statute of limitations. It would also thwart attempts to resolve disputes over a project. (*Endangered Habitats League, Inc.* v. *State Water Resources Control Board, supra*, 63 Cal.App.4th at p. 242.) "It is not the purpose of CEQA to foment prophylactic litigation." (*Ibid.*)

The Irrigation District contends it approved the project when it adopted resolution No. 94-107 on December 12, 1994. This resolution is entitled "Resolution of the Board of Directors of the El Dorado Irrigation District Regarding Conditional Offer to Pacific Gas & Electric (FERC Project No. 184-CA)." After a series of "whereas" clauses outlining the area's need for water, a prior unsuccessful effort to construct a water project, and the availability of Project 184 for purchase, the Irrigation District resolved that:

"1.) The Manager and District Counsel be directed to take the necessary steps at the earliest opportunity working with the assistance of the James Doolittle Company to prepare a conditional offer to PG&E to be submitted to PG&E as soon as possible after obtaining the confidential information (see 2 below) but no later than January 15, 1995.

"2.) The District's Counsel be authorized to review and approve for signature by the President of the Board of Directors an agreement between the County of El Dorado and the El Dorado Irrigation District regarding confidential information relating to previous negotiations between PG&E and the El Dorado County Board of Supervisors.

"3.) Prior to submittal of its conditional offer to PG&E, [the Irrigation District] will meet with Alpine and Amador Counties regarding its proposal and the potential effect of [the Irrigation District's] ownership of Project 184."

Contrary to the Irrigation District's contention, this resolution does not constitute project approval, as nothing in this resolution commits the district to purchasing Project 184. It is simply a resolution authorizing negotiations with that possibility in mind. It commits the district to exchanging confidential information, consulting with neighboring counties, and preparing an initial, conditional offer.

This situation stands in stark contrast to cases such as *Chula Vista, supra,* 23 Cal.App.4th at pages 1716-1717, in which the board of supervisors considered a staff recommendation to renew a five-year agreement for a private company's operation of a hazardous waste facility on county property. On November 28, 1989, the board authorized the director of purchasing and contracting "to enter into negotiations [with the private company] and, subject to successful negotiations and determination of a fair and reasonable price, award a service contract for five years . . . ." (*Id.* at p. 1717, italics omitted.) On January 29, 1992, the county and the private company executed a lease agreement. (*Ibid.*)

The court found the " 'project' (i.e., the agreement) was approved by the County on November 28, 1989, and the actual agreement executed on

January 29, 1992, was not substantially different from the original 'project.' " (*Chula Vista, supra,* 23 Cal.App.4th at p. 1720.) The court rejected the claim that the county had merely authorized "negotiations" with the private company. The resolution clearly indicated the board authorized its staff to negotiate *and award* the agreement. (*Ibid.*)

Here, however, there was no such authorization or even a determination that the Irrigation District would definitely go through with the purchase of Project 184. Instead, the resolution simply authorized negotiations toward that goal.

"The agency commits to a definite course of action [and therefore 'approves' a project within the meaning of the Guidelines] not simply by being a proponent or advocate of the project, but by agreeing to be legally bound to take that course of action." (*City of Vernon* v. *Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 688 [74 Cal.Rptr.2d 497].) Nothing in resolution No. 94-107 legally bound the Irrigation District to proceed with the purchase of Project 184, and it therefore cannot be deemed to be project approval.

Approval for the purchase of Project 184 did not come until September 1995. The Irrigation District and PG&E entered into an asset sale agreement on September 1, 1995, and that agreement was ratified by the Irrigation District Board of Directors in resolution No. 95-110 on September 25, 1995.

The notice of exemption filed in April 1995 preceded this project approval and is therefore invalid. Under these circumstances, a challenge to the exemption determination must be brought within 180 days of the date of project approval. (Guidelines, §§ 15062, subd. (d), 15112, subd. (c)(2), (5); *Chula Vista, supra,* 23 Cal.App.4th at pp. 1719-1720.) Plaintiffs sought to amend their writ petitions to include this challenge in October 1995, well within 180 days of the September 1995 project approval. They subsequently sought to amend their petition to name PG&E as a party in December 1995, also well within the required time frame.[17]

Plaintiffs' challenge to the Irrigation District's acquisition of Project 184 was timely.

---

[17]Given this conclusion, we need not resolve the parties' dispute as to whether PG&E was, in fact, an indispensable party. (But see *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 161-162 [217 Cal.Rptr. 893].)

## VI

### *Applicability of Categorical Exemptions*

 The Irrigation District contends Project 184 was categorically exempt from CEQA requirements, and it asserts the trial court erred in concluding otherwise.[18] The trial court properly concluded that while the acquisition of Project 184 was not governed by CEQA, the proposed operation of the project for consumptive water use required CEQA review.

Section 21084, subdivision (a), mandates that the Guidelines include "a list of classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt from this division." These categorical exemptions are found in article 19 (§ 15300 et seq.) of the Guidelines. "Where a project is categorically exempt, it is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' " (*Association for Protection etc. Values* v. *City of Ukiah* (1991) 2 Cal.App.4th 720, 726 [3 Cal.Rptr.2d 488].)

In keeping with general principles of statutory construction, exemptions are construed narrowly and will not be unreasonably expanded beyond their terms. (*McQueen* v. *Board of Directors* (1988) 202 Cal.App.3d 1136, 1148 [249 Cal.Rptr. 439]; see *East Peninsula, supra,* 210 Cal.App.3d 155, 171.) Strict construction allows CEQA to be interpreted in a manner affording the fullest possible environmental protections within the reasonable scope of statutory language. (*Azusa Land Reclamation Co.* v. *Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1192-1193, 1220 [61 Cal.Rptr.2d 447] (*Azusa*); *East Peninsula, supra,* 210 Cal.App.3d at p. 171.) It also comports with the statutory directive that exemptions may be provided only for projects which have been determined not to have a significant environmental effect. (§ 21084, subd. (a); *Azusa, supra,* 52 Cal.App.4th at p. 1192.)

 The Irrigation District contends its project is exempt from CEQA under either of two categorical exemptions. We discuss each in turn.

### A. *"Existing Facilities" Exemption*

The Irrigation District asserts Project 184 is exempt from CEQA review under Guidelines section 15301, the "existing facilities" exemption. This section provides an exemption for "the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private

---

[18]The Water Agency expressly distances itself from this claim.

structures, facilities, [or] mechanical equipment . . . , involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination. . . . The key consideration is whether the project involves negligible or no expansion of an existing use." As an example, the guideline lists in subdivision (b) "[e]xisting facilities of both investor and publicly-owned utilities used to provide electric power . . . or other public utility services[.]"

As the trial court's decision recognizes, this categorical exemption applies to a simple ownership transfer of a hydroelectric project. However, that is not the situation before us. Here, ownership was transferred *and* the focus of the project's operation was modified to permit consumptive use of an additional 17,000 acre feet of water.[19] A project that shifts from noncon-sumptive to consumptive use is not a negligible expansion of current use. It is a major change in focus, and thus does not fall within the *"existing facilities"* categorical exemption.

Cases cited by the Irrigation District are inapposite. For example, in *Committee for a Progressive Gilroy* v. *State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 864-865 [237 Cal.Rptr. 723], a waste treatment facility had been operating at reduced capacity. Resuming operation at a higher level came within the "existing facilities" exemption because the project had originally been approved for that higher capacity in compliance with CEQA.

Similarly, *Erven* v. *Board of Supervisors* (1975) 53 Cal.App.3d 1004, 1012-1013 [126 Cal.Rptr. 285], involved a project to repair and maintain existing roads. Given the limited nature of this project, the court concluded the existing facilities exemption was applicable. (*Id.* at pp. 1013-1014.) However, the court cautioned that a decision to widen the roads or acquire additional roads for improvement purposes would require environmental review because the exemption would not apply. (*Id.* at p. 1014.)

Here, the change from a utility-owned, nonconsumptive hydroelectric project to one that includes massive consumptive use removes the project from the scope of the existing facilities exemption.

---

[19]Although we agree with the trial court that mere change in ownership of Project 184 would not trigger CEQA review, we also agree with plaintiffs that this change in ownership becomes more significant when coupled with the change in project purpose. PG&E's focus was on water for hydroelectric purposes. An irrigation district, seeking to provide water for consumptive use, is arguably subject to different pressures when faced with an inelastic demand for water.

B. *"Ongoing Project" Exemption*

The Irrigation District contends its project is exempt from CEQA pursuant to Guidelines section 15261, subdivision (b), the "ongoing project" exemption. This Guideline provides: "A private project shall be exempt from CEQA if the project received approval of a lease, license, certificate, permit, or other entitlement for use from a public agency prior to April 5, 1973 . . . ." (*Ibid.*) Because of the remarkable change in proposed operation from nonconsumptive to consumptive use, this exemption is inapplicable.[20]

In *Nacimiento Regional Water Management Advisory Com.* v. *Monterey County Water Resources Agency* (1993) 15 Cal.App.4th 200 [19 Cal.Rptr.2d 1] (*Nacimiento*), a government agency built a dam before the enactment of CEQA. Its application for the project provided for the storing and release of water for various uses. The court held that the agency's annual decision to release varying amounts of water to different interests was part of an ongoing project and exempt from CEQA. (*Id.* at pp. 201, 204-208.)

The court observed: "Whether an activity requires environmental review depends upon whether it expands or enlarges project facilities or whether it merely monitors and adjusts the operation of existing facilities to meet fluctuating conditions." (*Nacimiento, supra,* 15 Cal.App.4th at p. 205.) The court reviewed two similar federal cases, *Upper Snake River* v. *Hodel* (9th Cir. 1990) 921 F.2d 232, 234-235, and *County of Trinity* v. *Andrus* (E.D.Cal. 1977) 438 F.Supp. 1368, 1388-1389, noting that ongoing projects that contemplate expansion or revisions are subject to environmental review.

---

[20]The parties have analyzed this issue under Guidelines section 15261, subdivision (b), the subdivision applying to ongoing *private* projects. As a result, we have done the same. However, we question whether this provision in fact applies. As this case involves a transfer of a private project to a public agency, can the project still be considered ongoing as a "private project" as outlined in section 15261, subdivision (b)? Or, does this transfer conceivably transform the project into one "being carried out by a public agency," the focus of section 15261, subdivision (a)? This subdivision provides: "If a project being carried out by a public agency was approved prior to November 23, 1970, the project shall be exempt from CEQA" unless certain conditions exist, including "(2) A public agency proposes to modify the project in such a way that the project might have a new significant effect on the environment." (*Ibid.*)

It is apparent that the project before us would not qualify for an exemption under section 15261, subdivision (a). This case does not involve a *public* project that was approved before November 23, 1970; the earlier approval was for a *private* project. Additionally, the shift from nonconsumptive to consumptive use would be a modification such that the project *might* have a new significant effect on the environment, and thus the Guideline itself precludes exemption.

As our ultimate conclusion is the same regardless of whether subdivision (a) or (b) is the appropriate starting place for analysis, we refrain from any additional musings on the matter.

(*Nacimiento, supra*, 15 Cal.App.4th at pp. 206-207.) The *Nacimiento* court concluded that, as in *Upper Snake River* and *County of Trinity*, this particular project did not entail revisions in procedures or enlargement of capacity to divert water, but instead continued operations within existing parameters. Thus, this project fell within the "ongoing project" exemption and did not require CEQA review. (*Nacimiento, supra*, 15 Cal.App.4th at pp. 207-208.)

Here, however, the Irrigation District sought to expand the project to include consumptive water use, significantly changing the focus of Project 184 to the extent that it cannot be termed an "ongoing project." (See *Main San Gabriel Basin Watermaster* v. *State Water Resources Control Bd.* (1993) 12 Cal.App.4th 1371, 1376 [16 Cal.Rptr.2d 288].)

In sum, the court properly concluded this project was not categorically exempt from CEQA.[21]

DISPOSITION

The judgment is affirmed. Respondents shall receive their costs on appeal.

Scotland, P. J., and Davis, J., concurred.

Petitions for a rehearing were denied December 1, 1999, and appellants' petitions for review by the Supreme Court were denied February 16, 2000. Chin, J. did not participate therein. Baxter, J., was of the opinion that the petitions should be granted.

---

[21]Consequently, we do not reach the question of whether any "exceptions to exemptions" apply. (See § 21084; Guidelines, § 15300.2.)