[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 334 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 335 
OPINION
Real parties in interest A.G. Spanos Construction Co., Inc. (Spanos), and Wal-Mart Stores, Inc. (Wal-Mart), appeal from a judgment granting a peremptory writ of mandate that set aside the approvals for a 207,000 square foot Wal-Mart retail store to be constructed in the mixed use (M-X) zone of a Spanos commercial and residential development in the City of Stockton (City) called Spanos Park West (also known as The Business Park).[1] The approvals were based on a letter to Spanos from the City's community development department director (Director) stating that "it has been determined" by an "[i]nitial staff review" that the plans for the store were "in substantial conformance" with a master development plan adopted by the City. *Page 336 
 The master development plan (MDP) is based upon the provisions of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21050
et seq.) that apply to projects that will be carried out pursuant to a development agreement. (Pub. Resources Code, § 21157, subd. (a)(4).)[2]
The MDP is an alternative to a project or program EIR (environmental impact report). (§ 21157, subds. (a)(4), (b)(2); Cal. Code Regs., tit. 14, § 15175, subd. (a) hereinafter CEQA Guidelines.) The anticipated projects are not subject to further environmental review if considered in a master EIR. (§ 21157, subd. (b)(2).)
 The City approved the 560 acre Spanos Park West pursuant to the MDP and allied enactments that condition the application of the MDP, including a density transfer development agreement (Density Agreement) that requires the construction of high density housing in the M-X zone. The original project was to include business and residential development but was later changed to retail and residential development. The environmental review of the project was contained in a master EIR and a supplemental EIR. After the environmental review had been completed, Spanos informed the City it desired to build a Wal-Mart store on parcels of The Business Park designated solely for high density residential development by the Density Agreement and the MDP.
 Plaintiffs challenge the validity of the Director's letter as an approval of the Wal-Mart project and the trial court agreed. Real parties in interest argue that plaintiffs may not do so because the period of limitations expired 35 days after the filing, on February 17, 2004, of a notice of determination that the project was exempt from CEQA. The complaint was filed July 22, 2004, more than 35 days after the filing of the notice of determination. In such a case section 21167 precludes review of a claim "that a public agency has improperly determined that a project" was exempt from CEQA. (§ 21167, subd. (d); see § 21080, subd. (b)(1).)
 Under CEQA Guidelines section 15112, subdivision (c)(2), the 35-day period of limitations runs "[w]here the public agency filed a notice of exemption in compliance with Section 15062. . . ." (Italics added.) Subdivision (a) of CEQA Guidelines section 15062 conditions the filing of the notice of exemption on the approval of the project by a public agency.
 Thus, under section 21167 and the CEQA Guidelines the limitations period will not run if (1) the Director's letter did not constitute an "approval" of the Wal-Mart project, or (2) the Director was not authorized by a "public agency," the City, to approve the project. *Page 337 
 The Director's action was contained in a letter to Spanos, labeled "status report," that said "it has been determined" by an "[i]nitial staff review" that the Wal-Mart plans were in substantial conformance with the MDP. The letter was not posted, published or otherwise made public, notwithstanding that the MDP authorizes an appeal by "[a]ny interested person" to the City Planning Commission of any decision of the Director within 10 days of the decision. (MDP, § 8.4.)
 For these reasons we shall conclude that the Director's letter did not constitute an "approval" of the Wal-Mart project.
 We also conclude that the Director's letter did not constitute a determination by a "public agency" since the Director was not delegated and could not have been delegated authority to approve a project requiring environmental review. (MDP, § 8.2; Kleist v. City of Glendale
(1976) 56 Cal.App.3d 770 [128 Cal.Rptr. 781].) The trial court found that "[t]he change from residential to a Superstore retail unit is a major change in the Development Plan that requires a discretionary act that triggers a CEQA review."
 Real parties in interest assume that plaintiffs may not challenge whether the Director "improperly determined" that he had authority to act for the City. They misread section 21167. The term "improperly determined" does not modify "public agency" and hence the limitations period of that section does not apply to the jurisdictional question whether the Director had authority to act for the City.
 We shall affirm the judgment.
 DISCUSSION I Introduction and Facts[3] The real parties in interest do not challenge the trial court's findings of fact and we include them as appropriate.
 A. Overview of the Project
 The trial court described the Spanos Park West project as follows: "This lawsuit involves the development of Spanos Park West, which is located on *Page 338 
the southwest corner of Eight Mile Road and Interstate 5 [in Stockton]. The Project involves the development of 560 acres with the original intent that the primary components would be business and residential. After a period of time, the primary components were changed to retail and residential due to the decline of business activity at that time. The Initial Environmental Document Transmittal form called for 2,514 residential units on 361.5 acres. It also provided for 1,700,000 sq. ft. of office space on 92.12 acres. The Spanos Park West [MDP] also contemplates two primary land use policies: 1) commercial/office policy, and 2) high density residential development policy. The same [MDP] also states that residential uses represents approximately 25 per cent of the proposed land use in the Plan area with four separate parcels for potential residential development. These four parcels are identified . . . as Parcel[s] 17, 17A, 18 and 19." The Wal-Mart store is to be located on parcels 17 and 17A.
 B. The Spanos Park West Planning Approvals
 On December 20, 2001, Spanos requested that the city council amend the City General Plan and zoning regulations and adopt a development agreement that would transfer Spanos' "obligation to construct . . . High-Density Residential (minimum of 935 multi-family residential units) from the existing High Density Residential sites within the Residential Component to [a] proposed Mixed Use (MX) portion of the Spanos West Project."
 The request was approved by the city council on January 29, 2002, by the adoption of an integrated set of enactments in compliance with the City Planning Code.[4] They conditioned the application of the MDP because the transfer of the multifamily units to the M-X zone required an amendment to the City's General Plan, amendments to the City zoning ordinances, and a Density Agreement, which mandates that Spanos construct 935 multifamily residential units within the M-X zone in order to comply with the policy of the general plan.[5] *Page 339 
 For this reason the MDP states that it provides a "comprehensive description of all land uses proposed for The Business Park consistent with the objectives, policies, general land uses, and programs of the City's General Plan."[6] The MDP also provides: "All development within the Plan area . . . is meant to be developed according to the primaryuse identified by A.G. Spanos Business Park Conceptual Site Plan, Figure 3-1, and Table 3-1, Land Use Summary." (Italics added.)
 Table 3-1 of the MDP lists "Multi-family" as the "Primary Land Use" for parcels 17, 17a, 18 and 19. In the text following the table, the MDP provides that "[t]he residential development program for A.G. Spanos Business Park consists of multifamily units. Four parcels (43.56 gross acres) within the Plan Area are proposed for multifamily [high density] residential development. The residential density would be 20+ units per gross acre."
 The trial court concluded: "Table 3-1 [AR 001410-13] only designates Parcel[s] 17, 17A, 18 and 19 for residential use. Of these lots only Parcel 18 has been used for residential use. Lot 19 was used for office space and of course Parcels 17 and 17A are used for this Superstore.[7]
For this reason alone the writ [of mandate] should issue."
 Lastly, the Density Agreement notes that the "City of Stockton's General Plan . . . provides that City shall maintain an adequate supply of land designated as high-density residential to meet the requirements of General Plan's Housing Element." For that reason it states that Spanos "has agreed to provide for and construct a minimum of Nine Hundred Thirty Five (935) multi-family units within the Mixed Use component of the Project." The Density Agreement recites that City "Code section 16-204.C requires that a development agreement be completed to implement the [MDP]. . . ." (Recitals G.) And it recites Spanos's "commitment to construct a minimum of [935] multi-family units as part of the development of The Business Park" and that "[i]n exchange for the? benefits to the public . . . of the multi-family residential development within The Business Park, [Spanos] desires to receive assurance that City shall grant permits and approvals for the development of the Project. In order to effectuate these purposes, the parties desire to enter in this Agreement."[8] *Page 340 
 For these reasons the trial court found that the Wal-Mart store was to be placed on lots 17 and 17A and that "[b]y approving this retail complex on Lot[s] 17 and 17A it not only exceeds the retail limit [of the MDP][9]
but it also prevents the construction of residential units." That led the court to find that "[t]he change from residential to a Superstore retail unit is a major change in the Development Plan that requires a discretionary act which triggers a CEQA review."[10]
 C. The Environmental Review
 As noted, the MDP is based upon the provisions of CEQA that apply to projects that will be carried out pursuant to a development agreement. (§ 21157, subd. (a)(4).)
 To meet the requirements of CEQA, "[a] master environmental impact report may be prepared for . . . [¶] (4) [a] project that will be carried out or approved pursuant to a development agreement." (§ 21157, subd. (a)(4).)[11] The report must "describe] [the] anticipated subsequent *Page 341 
projects that would be within the scope of the master environmental impact report," including "[t]he maximum and minimum intensity of any anticipated subsequent project, such as the number of residences in a residential development" and "[t]he anticipated location and alternative locations for any development projects." (§ 21157, subd. (b)(2)(B), (C).) "It is the intent of the Legislature . . . that a master environmental impact report shall evaluate the cumulative impacts, growth inducing impacts, and irreversible significant effects on the environment of subsequent projects to the greatest extent feasible." (§ 21156.) Environmental review thereafter is limited to projects not considered by the master report.
 The Spanos Park West Project involves the "redesign, development and operation of the previously approved A.G. Spanos Park (West) Project in northwest Stockton," that was reviewed in a prior EIR. Consequently, it is the subject of a supplemental environmental impact report (SEIR)/initial study (SEIR 3-87/IS 13-00) that "focus[es] on the proposed project revisions. . . ."
 The SEIR reviewed the environmental consequences of an integrated set of documents, the "proposed [MDP], Development Agreement, Density Transfer Development Agreement, and related planning and zoning amendments" that were jointly approved by the city council on January 29, 2002.[12] Since the Wal-Mart project was not authorized by these documents, it was not subject to environmental review in the SEIR.[13] *Page 342 
 The notice of preparation of the SEIR for the MDP recites that the "Development Agreement specifies the terms and conditions for the development of the M-X component and will ensure that applicant will develop the M-X component consistent with the [MDP]." The draft SEIR states that "[h]igh density residential uses will be provided on Parcels 17, 17a, 18 and 19. These high-density residential uses are intended to serve residents seeking the convenience of a highly concentrated urbanized setting that minimizes the reliance on personal vehicles and optimizes the relationship between home and the workplace."
D. The Director's Letter
 On October 29, 2003, the Director received approval from the A.G. Spanos Business Park Design Review Board (MDP, § 8.2) "of [Spanos's] site plan for construction of a 207,160 sq. ft. two-phased retail development . . . on approximately 22.38 acres within the Spanos Business Park . . .,"[14]
 The Director responded with a letter labeled "Status Report Regarding Site Plan, Landscape Plan, Elevation and Design Approval — retail store," dated December 15, 2003, that said, in effect, that an "[i]nitial staff review" has determined that the site plan and elevations "are in substantial conformance with the" MDP. The letter was addressed to Doucet Associates, representing Spanos, and "ccd" to Spanos and various employees of Stockton. The letter was not posted, published or otherwise made public.
 The Director was informed by letter from Spanos, dated the next day, December 16, 2003, and headed "Amendment to Density Transfer Development Agreement,"[15] that Spanos "presently lacks the space within the M-X component of Spanos Park West necessary to accommodate the . . . Six Hundred Twenty Seven (627) Units." The letter from Spanos to the Director was signed as approved by the Director on December 17, 2003. (See fn. 16, post.) *Page 343 
 Apparently, it was unclear to Spanos whether the December 15, 2003, letter from the Director to Spanos constituted an approval of the Wal-Mart project. Spanos sent a reply to the December 15 letter, dated February 5, 2004, from Spanos's lawyers, to the Director, stating Spanos's "understanding that [the] letter of December 15, 2003 constituted your approval of the Site Plan" and seeking "to confirm that your December 15, 2003 letter was the `decision' required by Section 8.2 [and] that as a result the 10 day period for filing an appeal of that decision has expired."[16] (Italics added.)
 Thus, the public was not informed of the Director's decision on December 15, 2003, [17] the form of the letter was such as to induce Spanos to seek a confirmation that it constituted an approval, and the only formal notice of the decision was the filing with the county clerk two months later, on February 17, 2004, of a notice of determination, also signed by the Director, which recites that it is in compliance with section 21152, subdivision (b) of the Public Resources Code, and that the Director "has determined [inter alia] that the Site Plan . . . applicable to the Project conform[s] to the standards set forth in the [MDP], which determination is a ministerial action not subject to CEQA review under [§] 21080(b)(1) and CEQA Guidelines [§] 15369."
 We will consider the remaining facts when appropriate to the discussion.
 II The Director's Determination Did Not Constitute an Approval
 The trial court ruled that the Director's "letter [is] not a formal order of approval" and for that reason "the [notice of determination], filed February 17, 2004 does not start the 35-day limitation to challenge the Government action."
 Spanos argues that the trial court did not have authority to substitute its decision for that of the Director in determining that the letter did not constitute an approval. It cites to Western StatesPetroleum Assn. v. Superior Court (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268]. However, Western States concerns a review of the record of a "quasi-legislative" administrative decision. (Ibid.) *Page 344 
 The case is inapposite. The trial court did not review the facts determined in a quasi-legislative action of a public agency. Rather, it reviewed the legal question whether the form of the Director's purported decision, a letter denominated "status report" stating that "an initial staff review" had determined that the Wal-Mart project was in substantial conformance with the MDP, constituted a final determination of a public agency. The letter was sufficiently unclear to prompt Spanos to seek a "confirm[ation]" that the letter "was the `decision' required by Section 8.2. . . ."
 The formal requirements of an approval turn on the nature of that which is decided. CEQA Guidelines section 15352, subdivision (a) provides in relevant part: "The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances."
 The rules and conditions of the MDP section 8.4, provide that "[a]ny interested person" aggrieved by the decision of the Director approving a proposal for compliance with the MDP has 10 days to appeal to the planning commission.[18] Since the rule provides for appeals by members of the public, it contemplates that such an approval by the Director must be capable of being known by the public, either because the approval is posted or published or otherwise distributed to the public.
 The letter of December 15, 2003, was not such an approval, because: (1) The letter was described as a "Status Report," thereby failing to inform the public that it was a final project approval, as the trial court found, and (2), so far as the administrative record shows, the letter was not posted, published, or otherwise made public at the time, so members of the public would not know to exercise their appeal rights. Moreover, the letter, although it did state that the status report concerned a retail store, did not state the size of the store or its location on specific parcels in the M-X zone of Spanos Park West, or that it displaced 627 units of high-density housing required by the Density Agreement, or other information that would have put the public on notice of the nature and consequences of the project. *Page 345 
 If the letter of December 15, 2003, was, in fact, made public at the time, it was the City's duty to include that fact in the administrative record. Section 21167.6, subdivision (e), provides in pertinent part: "(e) The record of proceedings shall include, but is not limited to, all of the following items: [¶] . . . [¶] (2) All staff reports and related documents prepared by the respondent public agency with respect to its compliance with the substantive and procedural requirements of this division and with respect to the action on the project. [¶] . . . [¶] (5) All notices issued by the respondent public agency to comply with this division or with any other law governing the processing and approval of the project."
 In keeping with this statute, it has been held that the duty to prepare an administrative record demonstrating compliance with CEQA falls "squarely" on the public entity. (Protect Our Water v. County of Merced
(2003) 110 Cal.App.4th 362, 372-373 [1 Cal.Rptr.3d 726].) "The consequences of providing a record to the courts that does not evidence the agency's compliance with CEQA is severe — reversal of project approval. [Citations.]" (Id. at p. 373.)
 Here, the administrative record was prepared by the City. (See § 21167.6, subds. (a), (b).) It fails to show that the "approval" letter of December 15, 2003, was made public at the time so as to allow members of the public to appeal to the planning commission. At oral argument, counsel for real party in interest Spanos conceded the letter of December 15 had not been made public. The administrative record therefore fails to demonstrate a timely valid project approval.
 Since there was no valid approval of the project, there was no valid notice of exemption, and the 35-day statute of limitations set out in section 21167, subdivision (d), did not begin to run.[19] (Countyof Amador v. El Dorado County Water Agency (1999) 76 Cal.App.4th 931, 963
[91 Cal.Rptr.2d 66].) Rather, the statute of limitations was "180 days from the date of the public agency's decision to carry out . . . the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project." (§ 21167, subd. (d); see County of Amador, supra,76 Cal.App.4th at p. 963.) *Page 346 
 In this case, "the date of the public agency's decision to carry out . . . the project" and the "commencement of the project" occurred at the earliest on June 22, 2004, if then, when the City granted Wal-Mart a use permit to sell alcoholic beverages in the new store. (See Miller v. Cityof Hermosa Beach (1993) 13 Cal.App.4th 1118, 1143 [17 Cal.Rptr.2d 408] [issuance of building permit].) Plaintiffs filed their petition on July 22, 2004, well within the 180-day period.
 III The Period of Limitations Is Dependent Upon Approval of a Project by a Public Agency
 Section 21167, subdivision (d), provides that "[a]n action or proceeding alleging that a public agency has improperly determined that a project is not subject to [CEQA] pursuant to subdivision (b) of Section 21080 [subdivision (b)(1) is applicable to ministerial projects] . . . shall be commenced within 35 days from the date of the filing by thepublic agency . . . of the notice authorized by . . . subdivision (b) of Section 21152." (Italics added.)[20] A failure to meet this deadline precludes review of a claim "that a public agency has improperlydetermined that a project" is exempt from CEQA. (§ 21167, subd. (d), italics added, see § 21080, subd. (b)(1).)
 Section 21167, subdivision (d), is amplified by the CEQA Guidelines. Under CEQA Guidelines section 15112, subdivision (c)(2), the 35-day period of limitations runs "[w]here the public agency filed a notice of exemption in compliance with Section 15062. . . ." (Italics added.) CEQA Guidelines section 15062, subdivision (a), applies only "[w]hen a publicagency decides that a project is exempt from CEQA . . . and the publicagency approves or *Page 347 
determines to carry out the project. . . ." (Italics added.) An approval is therefore a necessary requirement for the commencement of the limitations period pursuant to section 21167.
 Wal-Mart argues that "Public Resources Code section 21167, [subdivision] (d) requires that an objector challenge a determination that a project is exempt from CEQA within 35 days of the agency's filing of a notice of exemption. The filing and posting of a notice of determination or exemption constitutes constructive notice to all potential challengers, and no further notice is needed to trigger the limitations period." The notice of determination was filed on February 17, 2004. The complaint was filed July 22, 2004.
 Alternatively, Wal-Mart argues that plaintiffs' claims are barred by the 180-day "catchall" deadline measured from the date of the approval by the Director, December 15, 2003. (See § 21167, subd. (a); CEQA Guidelines, § 15062, subd. (d).) CEQA Guidelines section 15112, subdivision (c)(5)(A), provides that the period of limitations runs from the date of the "public agency's decision to carry out or approve the project. . . ." (Italics added.) The complaint, filed on July 22, 2004, did not meet this deadline.
 Thus, in either case advanced by the real parties in interest, "approval" by a public agency is a predicate to the commencement of the statute of limitations. (See County of Amador v. El Dorado County WaterAgency, supra, 76 Cal.App.4th at p. 963.)
 Accordingly, we next address whether the Director's determination constituted an action by a public entity, the City.
 IV The Director Was Not Delegated Authority to Approve the Wal-Mart Project As noted, the statute of limitations under CEQA Guidelines section 15112, subdivision (c)(2) does not begin to run from the filing of the notice of exemption of the Wal-Mart project unless the City, a public agency, has approved the project and that turns on whether the Director was delegated or could have been delegated the authority by the City to make the determination. *Page 348 
 CEQA places limitations on the authority of a public agency to delegate its responsibilities regarding the review of the environmental consequences of a project. (Kleist v. City of Glendale, supra,56 Cal.App.3d 770.) The court said: "The state guidelines require that the decision-making body or administrative official having final approval authority over a project involving a substantial effect upon the environment review and consider an EIR before taking action to approve or disapprove the project. ([CEQA] Guidelines, § 15085, subd. (g).) The requirement exists in part because `only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials. . . .'" (Id. at p. 778, italics omitted; see also Vedanta Society of So. California v. CaliforniaQuartet, Ltd. (2000) 84 Cal.App.4th 517, 525 [100 Cal.Rptr.2d 889];Planning Conservation League v. Department of Water Resources (2000)83 Cal.App.4th 892, 907 [100 Cal.Rptr.2d 173] ["Delegation is inconsistent with the purpose of the review and consideration function since it insulates the members of the council from public awareness and possible reaction to the individual members' environmental and economic values."].)
 Although the CEQA Guidelines say that a public agency may delegate its decision making authority to "any person . . . within a public agencypermitted by law to approve or disapprove the project at issue" (CEQA Guidelines, § 15356, italics added), that does not extend to a decision to approve a project with environmental consequences. A footnote to CEQA Guidelines section 15356 regarding the meaning of "permitted by law" refers to the Kleist decision.
 The question whether the Director was "permitted by law" to approve the Wal-Mart store is critical to this case. If the Director was not delegated authority by the City to approve the Wal-Mart project his letter of "approval" did not constitute a "decision by [a] public agency," as required by section 21167 and CEQA Guidelines section 15352.
 Section 8.3 of the MDP sets out the procedures by which a proposed project is deemed within the matters considered in the master EIR for the MDP. It authorizes the Director to approve a project which substantially conforms to the MDP, i.e., is within the uses permitted by the MDP, and thereby has been considered for its environmental consequences. By contrast, a project which is not within the uses permitted by the MDP has not been reviewed for environmental sufficiency.
 Section 8.3 of the MDP provides: "Amendments to the Land Uses and Development Standards contained within the [MDP] can be separated into two classes. (1) Minor Amendments, i.e., amendments that the [Director] finds are *Page 349 
consistent with the intent and purpose of [the MDP][21] and (2) Major Amendments, i.e., [include] a request for an alternative project or use that the [Director] finds is not presently included as an alternative project or use within the [MDP] and is a project or use which is inconsistent with and does not share the same or similar characteristics of an allowed use identified within the [MDP]."
 Although the MDP authorizes the Director to "find?" that a project conforms to the MDP, it does not authorize the Director to approve a project which is not within the MDP or has environmental consequences. That is, it does not grant authority to the Director to determine his own jurisdiction and hence does not authorize the Director to mistakenly find that the project is within the MDP.[22]
 Thus, section 8.3 of the MDP provides that "[m]ajor site specific changes, such as a request for a project or use which is not consistent with and does not share the same or similar characteristics of an allowed use identified within the [MDP] may be approved, provided: (1) the Design Review Board for A.G. Spanos Business Park recommends to the City of Stockton that the City issue a Conditional Use Permit for the project or use; and (2) that the City of Stockton City Planning Commission approves the proposed project or use and issue a Conditional Use Permit." If the planning commission determination is appealed to the city council its decision is subject to the conditions, inter alia, "[t]hat the proposed project is in conformance with the City's General Plan; [and] [t]hat the proposed project of use would not adversely impact the environment . . .,"[23]
 For these reasons the MDP, read in the light of Kleist and its progeny, marks the line of review authority between projects that previously have been reviewed for their environmental consequences, which the Director may approve, and projects that have not, which he may not approve. *Page 350 
 CONCLUSION and DISPOSITION
 For the reasons set forth above, the Director's nonpublic determination that the Wal-Mart project was in substantial conformance with the MDP violated the multifamily residential requirements of MDP, as mandated by the general plan and density transfer development agreement, violated the limited review authority delegated the Director by the City, and violated the provisions of CEQA that preclude the delegation of a public agency's authority to review a project that may have environmental consequences.
 Accordingly, the Director's determination did not constitute an approval by a public agency as required by Public Resources Code section 21167, subdivision (a), and CEQA Guidelines. For that reason neither the determination nor the notice of determination were valid and the period of limitations for challenging the determination did not commence.
 The decision of the trial court granting a peremptory writ of mandate barring all approvals of the development of the Wal-Mart superstore is affirmed. Plaintiffs are granted their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)
 Sims, J., concurred.
[1]The appeal of the City and the Stockton City Council was dismissed with prejudice on the motion of the City.
[2]A reference to a section is to the Public Resources Code unless otherwise designated or implied from the context.
[3]In part II of the Discussion we consider and reject real parties in int erest argument that we are bound by the Director's determination of the ultimate fact that his action constituted an approval of the Wal-Mart project.
[4]City Planning and Zoning Code, former section 16-204 B., provided that "[f]or projects that will be designated as Mixed Use . . . applications for a General Plan and Zoning Map amendments shall be submitted concurrently with the application for a Master Development Plan."
[5]As relevant here, the following resolutions and ordinance jointly were adopted by the city council on January 29, 2002. (1) "Resolution Approving the Master Development Plan Regarding the Mixed Use (MX) Component (A.G. Spanos Business Park) of the Spanos Park West Project." (Resolution No. 02-0054.) (2) "Resolution Approving the General Plan Amendment Regarding the Spanos Park West Project — Mixed Use (MX) Component, A.G. Spanos Business Park." (Resolution No. 02-0053.) (3) "Ordinance Approving the Density Transfer Development Agreement for the Spanos Park West Project." (Ordinance No. 007-02.) "Resolution Certifying The Final Environmental Impact Report. . . for the Spanos Park West Project." (Resolution No. 02-0052.)
[6]To this end the general plan amendment, as noted by the trial court, recites that "[t]he proposed Development Agreement is consistent with and necessary for the consideration and approval of the related discretionary General Plan Amendment rezoning and [MDP] applications. . . ."
[7]Parcels 17 and 17A provide, respectively, for 350 and 250 multifamily units.
[8] In recognition that the Wal-Mart store displaced residential housing mandated by the Density Agreement, on October 9, 2003, Spanos filed a development agreement application to "[a]llow Spanos to further develop the Spanos Park West power center by transforming Spanos obligation to construct high density residential units within Spanos Park West to other locations within the City." (Italics added.)
On December 16, 2004, the day following the date of the Director's letter at issue in this case, Spanos sent a letter to the Director titled "Amendment to Density Transfer Develop Agreement" informing him that "Spanos presently lacks the space within the M-X component of Spanos Park West necessary to accommodate the . . . Six Hundred Twenty Seven (627) [multifamily] Units." In it Spanos requested a delay in the construction of the 627 units mandated by the Density Agreement and the approval of the Director to construct the units within 10 years within the corporate limits of the City of Stockton. The letter reflects that the Director signed the letter as approved on December 17, 2003.
The approval of the amendment to the Density Agreement was not authorized by the MDP since it was not preceded by approval by the design review board, as consistent with the MDP, and was not within the authority granted the Director by the MDP. (MDP, §§ 8.1 to 8.3.)
[9] The retail square foot limit of the MDP for parcels 17 and 17A is shown on Table 3-1 of the MDP as zero for parcel 17 and 50,000 for parcel 17A, well below the 207,000 square feet of the Wal-Mart proposal.
[10] CEQA requires an EIR "whenever substantial evidence supports a fair argument that a proposed project `may have a significant effect on the environment.'" (Laurel Heights Improvement Assn. v. Regents of Universityof California (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231,864 P.2d 502].)
[11] "The Master EIR procedure is alternative to preparing a project EIR, staged EIR, or program EIR for certain projects which will form the basis for later decision making. It is intended to streamline the later environmental review of projects or approval included within the project, plan or program analyzed in the Master EIR. Accordingly, a Master EIR shall, to the greatest extent feasible, evaluate the cumulative impacts, growth inducing impacts, and irreversible significant effects on the environment of the subsequent projects." (CEQA Guidelines, § 15175, subd. (a).) It includes "Projects that will be carried out or approved pursuant to a development agreement." (Id., subd. (b)(5).) The required contents of a master EIR are specified in CEQA Guidelines section 15176.
[12] The notice of preparation of SEIR for Spanos Park West states that "the Supplemental [EIR] Study . . . will focus on the proposed project revisions that will require various discretionary approvals including: General Plan Amendments, Rezonings, Specific Plan Amendment for Eight Mile Road, Master Development Plan, Development Agreement, new Tentative Subdivision Maps, Special Use Permits, and/or Site Plan Reviews, etc."
The notice further states that one of the goals for the M-X component of The Business Park is "high density residential apartment uses."
The SEIR reviewed the noise and traffic impacts of the proposed multifamily residential units.
[13] The record contains a memorandum to Spanos from Fehr Peers, transportation consultants, dated July 8, 2003 (after the adoption of the MDP and allied agreements), that purports to "document? [a] trip generation comparison between the currently proposed Spanos Park West development [including the Wal-Mart project] and the previously approved
project." (Italics added.) However, it is not included in the documents reviewed by the A.G. Spanos Business Park Design Review Board, dated October 29, 2003, a predicate to a determination by the Director (MDP, § 8.4) and is not within the Director's determination at issue in this case. Moreover, as to this document, the trial court found it failed to make the correct traffic generation comparison.
[14] The document recites that "[a] written finding of consistency and compatibility of the terms of the [MDP], Development Agreement and all applicable policies and regulations for the building permit process will follow with subsequent submissions." However, we have found nothing in the record that shows any subsequent submissions other than the plans for the structure and associated landscaping and parking configurations.
[15] As noted above, on October 9, 2003, Spanos filed an "Amendment to Development Agreement Application [to] [a]llow Spanos to further develop the Spanos Park West power center by transforming Spanos['s] obligation
to construct high density residential units with Spanos Park West to other locations within the City." (Italics added.) So far as the record shows, the application was not acted upon and is not part of the Director's determination.
[16] The copy of the letter in the file does not show an affirmance by the Director.
[17] In the light of the lack of notice to the public and the Spanos letter to the Director on December 16, 2003, we find it odd that Spanos argues that plaintiffs failed to exhaust the appeal rights provided by the MDP.
[18] Section 8.4 of the MDP provides in relevant part: "Any interested person dissatisfied with any decision of the Community Development Director . . . required by the Master Development Plan, may, within ten (10) days of such decision?, appeal such decision? to the Planning Commission, by the filing, with the Community Development Director, of a written notice of appeal. Such notice of appeal shall [inter alia] (1) specify the decision . . . being appealed [and] (2) the reasons for such appeal. . . ."
[19] Section 21167, subdivision (d), provides: "(d) An action or proceeding alleging that a public agency has improperly determined that a project is not subject to this division pursuant to subdivision (b) of Section 21080 or Section 21172 shall be commenced within 35 days from the date of the filing by the public agency, or person specified in subdivision (b) or (c) of Section 21065, of the notice authorized by subdivision (b) of Section 21108 or subdivision (b) of Section 21152. If the notice has not been filed, the action or proceeding shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project."
[20] A "`Public agency'" is defined in section 21063 as "any state agency, board, or commission, any county, city and county, city, regional agency, public district, redevelopment agency, or other political subdivision." It is somewhat differently defined in CEQA Guidelines section 15379 as "any state agency, board, or commission and any local or regional agency, as defined in these guidelines." Section 21063 is cited as authority for this definition.
 "Local agency" is defined in the Guidelines as including "but is not limited to cities . . . and any board, commission, or organizational subdivision of a local agency when so designated by order or resolution of the governing legislative body of the local agency." (CEQA Guidelines, § 15368.)
 The authority for CEQA Guidelines section 15368 is Public Resources Code section 21062. It provides that "`Local agency' means any public agency other than a state agency, board or commission. For purposes of this division a redevelopment agency and a local agency formation commission are local agencies, and neither is a state agency, board or commission." (Ibid.)
[21] Minor Amendments are not subject to public hearings. They include "[c]hanges in development intensity or residential density that do not exceed the intensity or density established by the [MDP] and considered by the [MDP] EIR, such as lot line adjustments, a compatible land use change as provided in Section Three or adjustments to the local street system, are examples of minor adjustments that shall not require an extensive amendment process and shall be subject to the approval of the [Director] based on an approval recommendation of the Design Review Board."
[22] As noted above, the MDP, as it provides, must be read in the light of the enactments adopted by the city council jointly with the MDP and which condition its application, such as the Density Agreement, which requires the construction of multifamily units within the M-X zone of Spanos Park West.
[23] The MDP does authorize the planning commission to review a proposed project for its environmental consequences but only if "all significant adverse impacts of the proposed project or use can and will be mitigated to less than significant." (MDP, § 8.3.)